IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| RICHARD F. MCCUE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:05-cv-554-DRH |
| | ) | |
| STEVE ALDRIDGE, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## REPORT AND RECOMMENDATION

This matter has been referred to United States Magistrate Judge Donald G. Wilkerson by

United States District Judge David R. Herndon pursuant to 28 U.S.C. § 636(b)(1)(B), Federal

Rule of Civil Procedure 72(b), and SDIL-LR 72.1(a) for a Report and Recommendation on the

Motion for Summary Judgment (Doc. 32), filed by Defendant Steve Aldridge on January 10,

2007, and the Motion for Summary Judgment (Doc. 37), filed by Defendants Terry Caliper and

Willard Elyea on February 8, 2007. For the reasons set forth below, it is **RECOMMENDED**

that the Motion for Summary Judgment (Doc. 32) be **DENIED**, that the Motion for Summary

Judgment (Doc. 37) be **DENIED**, and that the Court adopt the following findings of fact and

conclusions of law:

### FINDINGS OF FACT

**Procedural History**

Richard McCue ("Plaintiff"), an inmate in the Tamms Correctional Center, filed this civil

action on August 5, 2005, alleging violations of his constitutional rights pursuant to 42 U.S.C. §

1983. Specifically, Plaintiff alleges that Defendants Dr. Steve Aldridge, Dr. Willard Elyea, and

Nurse Terry Caliper were deliberately indifferent to his serious medical needs, and that each of

these defendants retaliated against him for filing grievances regarding his treatment. Defendant

Aldridge filed a motion for summary judgment on January 10, 2007, and Defendants Caliper and Elyea filed a joint motion for summary judgment on February 8, 2007. Plaintiff filed responses to both motions.

**Substantive History**

On April 5, 2004, Plaintiff saw Defendant Aldridge, a dentist at the Tamms Correctional Center, and complained about a broken upper denture (Doc. 32 at ¶ 1; Doc. 1-3 at 12). Plaintiff claims that during this visit Defendant Aldridge informed him that he needed a new upper denture and that he would have to pay the full lab cost to get the denture repaired or replaced (Doc. 1 ¶3; Doc. 1-2 at 1). Defendant Aldridge asserts that he told Plaintiff that his dentures could be repaired, but that Plaintiff preferred to have a new set made (Doc. 32 at ¶ 2). Both parties agree that Dr. Aldridge informed Plaintiff that he would have to sign a money voucher and pay a lab fee of seventy-one dollars in order to obtain a new set of dentures (Doc. 32 at ¶5; Doc. 47 at ¶6). Plaintiff claims that he explained to Dr. Aldridge that his denture was approximately fifteen years old and was repaired approximately eight years ago, but had again broken through the normal course of use (Doc. 1-2 at 1). Plaintiff states that rather than further argue about the payment issue, he agreed with Defendant Aldridge that he needed a new denture and Defendant Aldridge said he would set up another appointment to take the impressions (Doc. 1-2 at 2).

On April 6, 2004, Plaintiff spoke to Dr. Powers and complained about having to pay for the denture (Doc. 1-2 at 2). Plaintiff claims that Dr. Powers told him that he did not understand why Plaintiff would have to pay for the denture, and that he should contact Defendant Caliper before filing a grievance about it (Doc. 1-2 at 2).

Also on April 6, 2004, Plaintiff sent a resident request to Defendant Caliper, who is a nurse and health care administrator at Tamms, requesting to speak with her regarding his dental problems (Doc. 1-5 at 1). He informed Defendant Caliper that Dr. Powers had told him he should speak with her because Defendant Aldridge had told him he would have to pay a large lab fee to get his dentures repaired or replaced (Doc. 1-5 at 1). The request was stamped received and reviewed on April 7, 2004, and stated, "Will see on rounds." (Doc. 1-5 at 1). A remark was later written on the form, dated April 12, 2004, stating, "Already on dental line for April 28, 2004." (Doc. 1-5 at 1).

Plaintiff states that on April 15, 2004, he spoke with Defendant Caliper who told him she would speak to Dr. Aldridge about the matter (Doc. 1-2 at 2). Plaintiff alleges that on April 21, 2004, his denture fractured down the middle into two pieces while he was trying to eat with it, making it totally unusable (Doc. 1 at ¶ 7). On April 23, 2004, Plaintiff states that he spoke to Defendant Caliper again, showing her the fractured denture, and was told that after speaking with Dr. Powers about the issue, Plaintiff would not have to pay for the replacement of his dentures (Doc. 1-2 at 2). Plaintiff also states that on April 27, 2004, Plaintiff showed Dr. Powers the broken denture and that Dr. Powers confirmed that he had spoken with Defendant Caliper, telling Plaintiff not to worry as Defendant Caliper had taken care of the matter (Doc. 1-2 at 2).

On April 28, 2004, Defendant Aldridge took the top impression of Plaintiff's gum tissue (Doc. 1-3 at 12; Doc. 1-2 at 2). After he took the upper impression, Defendant Aldridge asked Plaintiff to sign a voucher payable to Wexford Health Services for approximately seventy-one dollars. Plaintiff states that after he explained to Defendant Aldridge that both Dr. Powers and Defendant Caliper had informed him that the IDOC would pay for the denture, but Defendant Aldridge told him that he worked for Wexford, not the IDOC, and it was his policy to charge

prisoners for all denture replacements or repairs (Doc. 1-2 at 2). Plaintiff also states Defendant

Aldridge told him that since he had talked to Dr. Powers and Defendant Caliper about this issue

and they told Plaintiff not to worry, that they should finish the procedure (Doc. 1-2 at 2).

Also on April 28, 2004, Plaintiff sent two resident requests, one to Dr. Powers and the

other to Defendant Caliper (Doc. 47 at 10; Doc. 1-5 at 3). In the request to Dr. Powers, Plaintiff

reported on his dental visit and asked if Dr. Aldridge was double billing by charging the IDOC

and the prisoners for dentures and whether he needed to file a grievance about the matter (Doc.

47 at 10). There was a response to this resident request which stated, "I met with Dr. Aldridge

earlier this week and the denture will be forthcoming. Since the broken denture is approximately

fifteen years old the inmate should not be charged." (Doc. 47 at 10).

In the resident request sent to Defendant Caliper, Plaintiff informed her that Defendant

Aldridge told him he had to pay the seventy-one dollars and that, after Plaintiff explained to

Defendant Aldridge that she and Dr. Powers stated he should not have to pay, he said, "Well then

perhaps Ms. Caliper and Dr. Powers should finish the procedure." (Doc. 1-5 at 3). Plaintiff then

stated that he did not want any problems, but wanted to know if he needed to file a grievance

(Doc. 1-5 at 3). There was no response noted on the resident request.

On May 1, 2004, Plaintiff filed a formal written grievance detailing the facts above, and

requesting (1) that Defendant Aldridge be investigated for over charging the IDOC and

prisoners, (2) that the state pay for his denture, and (3) that he not be retaliated against for filing

the grievance (Doc. 1-2 at 1). This grievance notes a response made on May 4, 2004, in which

Ms. Caliper states that Dr. Powers, the Medical Director, discussed the issue with Defendant

Aldridge and that Defendant Aldridge had agreed to provide Plaintiff with dentures and only

charge the $2 co-payment for a non-emergency dental appointment (Doc. 1-2 at 1). The grievance was denied with the reasoning that "the issue appears resolved." (Doc. 1-2 at 3).

When Plaintiff saw Defendant Aldridge for a biannual exam on May 5, 2004, however, Plaintiff states that Defendant Aldridge told Plaintiff that he was aware of what Defendant Caliper and Dr. Powers had said, but that he worked for Wexford, not the IDOC, and that if Plaintiff did not prepay for his denture then he would have to do without a denture and treatment for his upper gum (Doc. 1 at ¶ 11). Plaintiff claims that he refused to sign the payment voucher after telling Defendant Aldridge that due to his denture becoming totally unusable, he was grinding his bottom teeth during his sleep into his upper gums, causing his gums to become painfully sore, swell, and bleed (Doc. 1 at ¶ 11). Plaintiff states that he requested a rubber mouth guard and a soft diet but was refused (Doc. 1 at ¶ 11). Defendant Aldridge admits that because Plaintiff would not sign the voucher, he was not scheduled to be seen again to complete the process of obtaining dentures (Doc. 32 at ¶ 7).

On May 30, 2004, Plaintiff wrote a letter to the Comptroller of Illinois, Daniel Hynes, alleging that Defendant Aldridge and Wexford Health Services were illegally double billing the IDOC and inmates for dental procedures and requesting an investigation (Doc. 1-4 at 1). On June 4, 2004, the Office of the Comptroller responded, informing Plaintiff that they were forwarding his letter to the Department of Professional Regulation and to the IDOC (Doc. 1-4 at 2). Plaintiff alleges that it was shortly after his letter was forwarded to the IDOC that the retaliation began (Doc.1 at ¶ 12).

On June 1, 2004, Plaintiff wrote the prison warden, Mr. Shelton Frey, stating that he was writing him per his request following their conversation on May 31, 2004, where, after Plaintiff showed him the grievance he had filed on May 1, 2004, Warden Frey told him he would look

into it as soon as possible (Doc. 1-5 at 4). There was a Post-It note dated June 16, 2004, attached to this resident request, asking Defendant Caliper the "status on this?" (Doc. 1-5 at 4). On June 21, 2004, Defendant Caliper sent an e-mail response to Warden Frey stating that she had spoken with Dr. Powers that same day and it is their opinion that Plaintiff has had his dentures long enough with numerous repairs such that he should be provided with a new one at no cost to Plaintiff (Doc. 1-5 at 5). Defendant Caliper further states that Dr. Powers told Defendant Aldridge to proceed with making the denture at no charge to Plaintiff (Doc. 1-5 at 5).

On July 1, 2004, a series of e-mail exchanges between Defendants Caliper and Defendant Elyea occurred about Plaintiff's allegations, all with the subject line "Allegations- Offender Richard McCue N46136." (Doc. 1-5 at 6). The first e-mail, sent at 9:19 a.m. by Defendant Elyea, stated as follows:

> Concerning the above issue, I spoke directly with Dr. Aldridge, the dentist at Tamms CC. Dr. Aldridge assures me that he followed the A.D. when dealing with the offender's dental problem. The offender will be provided with a repaired or replaced denture if and when the offender signs his voucher for payment. This process is in accordance with the A.D. The offender would not have to pay for the dentures if this were the first one he received from IDOC or if he required additional specific teeth removed while in IDOC. Thanks.

(Doc. 1-5 at 6)

The next e-mail was a reply sent from Defendant Caliper to Defendant Elyea at 10:07 a.m., stating:

> Dr. Elyea, An update concerning McCue's dental issue….Dr. Powers reviewed this incident and found Inmate McCue's denture was 17 years old with numerous repairs documented. Dr. Powers feels that McCue should be provided a new denture without charge to the inmate and has advised Dr. Aldridge to provide him with one….Terry

(Doc. 1-5 at 6)

The final e-mail is a response from Defendant Elyea back to Defendant Caliper, sent at 10:12 a.m., which states:

> That's not what the A.D. says. If the state provided him with the original denture then all subsequent repairs/replacements are charged to the offender unless IDOC removes more teeth and an entirely new denture is needed. Once you pay for one, you place the entire department in a precarious position. Thanks.

(Doc. 1-5 at 6).

On the same day of this e-mail exchange, July 1, 2004, Defendant Caliper sent a memorandum to Plaintiff stating, "Dr. Powers has been informed that you must pay for all denture replacement/repairs according to Administrative Directive 04.03.102 Dental Care for Offenders. If you wish to proceed with obtaining a denture please let me know." (Doc. 1-3 at 10).

On July 21, 2004, Plaintiff was again seen by Defendant Aldridge (Doc. 1-3 at 12). Plaintiff claims that he showed Defendant Aldridge a copy of the counselor's response to his May 1, 2004 Grievance, which stated that he was to receive the dentures and only be charged a two-dollar co-payment (Doc. 1-3 at 12). Plaintiff states that Dr. Aldridge responded by stating that he did not care about the counselor's response because now he would have to pay for writing to Comptroller Hynes (Doc. 1 at ¶ 13).

On July 21, 2004, Defendant Caliper wrote a memorandum to Plaintiff after Plaintiff sent a request to an assistant warden requesting a copy of Administrative Directive 04.03.102 Dental Care for Offenders (Doc. 1-3 at 11). Defendant Caliper explained that although the Health Care Unit does not allow inmates to inspect the directives, "the AD that applies to your issue [states] 'offenders who have lost or broken a dental prosthetic through negligence shall be required to pay the dental laboratory fee for replacement. The offender shall be required to sign a Request for Payment, DC 828, authorizing the deduction of the payment from present or future funds in

his trust fund account. The time frame for replacement shall be according to priority and availability as determined by the dentist.' ". (Doc. 1-3 at 11). The letter further stated that "As both Dr. Powers and myself have told you, Dr. Elyea, IDOC Medical Director, has reviewed your dental issue and determined that Dr. Aldridge is following IDOC procedure in that if you sign the voucher for payment, you will be provided with a denture." (Doc. 1-3 at 11).

In a grievance dated July 22, 2004, Plaintiff complained again that on July 21, 2004, Defendant Aldridge refused to treat him unless he signed the voucher despite showing him the counselor's response on his May 1, 2004 grievance (Doc. 1-2 at 4). Plaintiff also alleged that Defendant Elyea overruled Dr. Power's decision in order to take revenge against him for writing to the Comptroller Hynes outlining Defendant Aldridge's illegal activity (Doc. 1-2 at 5). While he raised the possibility that Defendant Elyea may have mistakenly overruled Dr. Powers because he is not on site like Dr. Powers is, he also stated that there was absolutely no negligence on his part and there had been no showing that he was negligent; therefore, he argued, AD 04.03.102 did not apply to him (Doc. 1-2 at 5). Plaintiff also pointed out that a memo addressed to all inmates from Defendant Caliper, dated November 13, 2000, states that all inmates "shall have a $2 fee-for-service charge assessed for all non-emergency medical and dental services," and that "Medical and dental care shall not be denied based upon an inmate's inability to pay. If an inmate is without funds, a $2 fee-for-service charge shall be assessed against any future funds." (Doc. 1-3 at 9). The memo also states that no fee shall be assessed for required or emergency medial or dental services (Doc. 1-3 at 9).

On July 28, 2004, a response to the grievance was provided in which Defendant Caliper states that Dr. Aldridge will not provide Plaintiff a denture until he signs the voucher for payment (Doc. 1-2 at 4). Defendant Caliper also stated:

> Inmate McCue may contact the Department of Professional Regulation, the state comptroller's office or any state agency that he elects. Dr. Aldridge is following Administrative Directive 04.03.102 Dental Care for Offenders and there is 'no illegal activity' as Inmate McCue alleges. Dr. Elyea, IDOC Medical Director, did not 'mistakenly overrule Dr. Powers'. Dr. Elyea reminded Dr. Powers and myself of the wording of the directive and we acknowledged that Inmate McCue's replacement denture had been inadvertently approved. As I have told Mr. McCue when I have made rounds on his living unit, my advice is to accept the decision and sign the voucher if he wants the replacement denture.

(Doc. 1-2 at 4).

On August 8, 2004, Plaintiff sent a request to Defendant Caliper advising her that based on her response to his grievance, he would sign the voucher for prepayment of the denture "being that I have no choice in the matter." (Doc. 1-5 at 11). Handwritten on the request it states, "Scheduled dental appt for Sept 29, 2004 8/9/04." (Doc. 1-5 at 11). On August 11, 2004, Plaintiff again sent a resident request to Defendant Caliper requesting to be seen by the dentist as soon as possible, agreeing to sign the money voucher because he needed treatment badly (Doc. 1-4 at 3). Plaintiff also sent another resident request that same day addressed to "Dentist" agreeing to sign the money voucher and requesting to be seen as soon as possible to get his denture replaced or repaired as he reported having gone without a denture for four months (Doc. 1-4 at 4).

On September 1, 2004, Plaintiff again sent a resident request to Defendant Aldridge stating, "I've repeatedly asked to see you and said I'd sign the money voucher for the denture. What's the holdup? You know I haven't had an upper denture since April and my bottom teeth cut into my top gum while I sleep. My gum stays sore, swollen, & bleeds. I need a denture / rubber mouth guard ASAP. I'll pay, please reply!" (Doc. 1-4 at 5). There is no evidence that Plaintiff's request was ever responded to as the portion of the request form for remarks by staff members was left blank (Doc. 1-4 at 5). Defendant Aldridge alleges in his motion for summary

judgment that he is not personally involved in scheduling inmates for their dental visits (Doc. 32 at ¶ 10). Plaintiff disputes this allegation, citing both Defendant Aldridge's handwritten and signed dental records (Doc. 1-3 at 12).

On October 20, 2004, Inmate Corey L. Fox, K95803, executed an affidavit stating that while he was housed in a cell close to Plaintiff's cell, he witnessed, on numerous occasions, Plaintiff complaining to the nursing staff as they made their rounds and requesting to be seen by the dentist about his gums being swollen and bleeding due to his broken denture (Doc. 1-4 at 6). According to Inmate Fox, Plaintiff complained also about his inability to eat and digest his food to the nurses, including Defendant Caliper, but was told by Defendant Caliper that she had scheduled him to be seen by Defendant Aldridge back in August 2004, and that is all she could do in this situation, admitting she did not know the reason for the delay (Doc. 1-4 at 6). Inmate Fox also states that on his way to the yard, he observed Plaintiff standing at his door, where he recognized that Plaintiff's entire upper mouth was enlarged, swollen, and bloated (Doc. 1-4 at 6). Inmate Fox also states that when Plaintiff exposed his upper gums, he noticed severe swelling, redness, and infectious bleeding (Doc. 1-4 at 6). Inmate Fox also asserts that Plaintiff showed him a set of upper dentures that were broken down the center in two pieces (Doc. 1-4 at 6).

On November 8, 2004, Plaintiff saw Defendant Aldridge for the first time since July 21, 2004, and requested treatment for his upper gums (Doc. 1 at ¶15; Doc. 1-3 at 12). Defendant Aldridge allegedly told Plaintiff that if he did not sign the voucher he would have to do without a denture (Doc. 1-2 at 10). Plaintiff alleges that after he signed the voucher, Defendant Aldridge still refused to treat him until after there was a check made out to Wexford (Doc. 1-2 at 10). Defendant Aldridge dated and signed an entry in Plaintiff's dental record noting that Plaintiff now wants to pay the lab fee, that the fee had gone up, that Plaintiff did sign the voucher, and

that a visit was to be scheduled to take impressions after it is verified that Plaintiff has enough money to pay the lab fee (Doc. 1-3 at 12). Plaintiff alleges that the denial of treatment until Plaintiff pays for it in advance is illegal and clearly shows a conspiracy among the defendants to delay or deny plaintiff proper dental care (Doc. 1 at ¶15).

On November 12, 2004, Plaintiff filed a grievance stating what happened at the November 8, 2004, visit to Defendant Aldridge, alleging again that the denture did not break because of his negligence, and advising of a possible civil court action (Doc. 1-2 at 10). On November 15, 2004, a response was filed in which Defendant Caliper stated Defendant Aldridge would not receive a replacement prosthetic until Plaintiff paid for it, that this position was "just not pulled out of the air" but consistent with Administrative Directive 04.03.102 Dental Care for Offenders (Doc. 1-2 at 10). Defendant Caliper again cited the directive, which states that '[o]ffenders who have lost or broken a dental prosthetic through negligence shall be required to pay the dental laboratory fee for replacement." (Doc. 1-2 at 10). Defendant Caliper also stated that Defendant Elyea, as IDOC Medical Director, was consulted regarding this issue and he advised that the procedure must be followed (Doc. 1-2 at 10). The grievance was denied at all levels. Defendant Aldridge, however, admits that he does not know if it was Plaintiff's negligence that caused the denture to break (Doc. 37-3 at 10).

On December 27, 2004, Plaintiff next visited Defendant Aldridge, who resumed taking impressions of Plaintiff's mouth (Doc. 1-3 at 12; Doc. 1 at ¶ 16).

Plaintiff claims that on February 7, 2005, Nurse Lynn Stokes told him that although he had put in a request for sick call regarding his gums, Defendant Caliper had ordered that Plaintiff was not to be seen (Doc. 1-2 at 14; Doc. 1 at ¶ 17). Plaintiff also produced an affidavit from fellow Inmate Bennie Cunningham, dated February 20, 2007, where he states that on February 7,

2005, he overheard Nurse Lynn Stokes tell Plaintiff that Defendant Caliper would not allow him to be seen at sick call concerning his gums (Doc. 1-4 at 8). Inmate Cunningham also states that he overheard this same statement from Nurse Grace Hart on February 7, 2005 (Doc. 1-4 at 8). Inmate Cunningham further states that on February 8, 2005, he overheard Kristin Kwasniewski tell Plaintiff that there was nothing she could do because she had spoken with Defendant Caliper on the phone and was told that Plaintiff will not be called to sick call about his gums (Doc. 1-4 at 8).

Plaintiff filed a grievance on February 7, 2005, detailing his conversation with Nurse Stokes, alleging that Defendant Caliper refuses to let him be seen at sick call, and requesting he be seen by the doctor, be put on a soft diet, and be given medication for constipation (Doc. 1-2 at 14). Defendant Caliper indicates in the response to the grievance, dated February 14, 2005, that "Dr. Aldridge has been consulted and did not see a clinical indication to order Mr. McCue a special diet . . . In terms of his request to be seen by the physician for "gums" he has received an over-the counter preparation, Oragel." (Doc. 1-2 at 14). Plaintiff states that he saw a Dr. Chhabra after he filed his grievance, but only because he caught him doing a night round – not because he was granted sick call (Doc. 1 at ¶ 18). The grievance was denied.

On February 9, 2005, Plaintiff filed another grievance, stating that he asked Nurse K. Ksasniewski to go to sick call for his bleeding gums but was again refused (Doc. 1-3 at 1). Plaintiff states that Ms. Ksasniewski called Defendant Caliper and then told Plaintiff that she could not help him because Defendant Caliper refused to let him be seen at sick call (Doc. 1-3 at 1). Plaintiff then states in the grievance that "I've heard from staff members that Ms. Caliper's reasoning for denying me this necessary medical treatment for my gums etc. is so that it won't be documented for any future Civil Action against her and Dr. S. Aldridge for denying me a denture

for the past ten months." (Doc. 1-3 at 1). He then requested to be seen by a doctor for his

bleeding gums (Doc. 1-3 at 1).

Although Plaintiff's grievance was denied, Defendant Caliper submitted a written

response to Plaintiff's request stating:

> I deny the allegation. My only role in processing inmate request for medical
> services is to review the request, note the date it was received and refer to the
> nursing staff for screening. I received a request from McCue on 2/7/05. It was
> referred to the 3011 shift and the nurse screening the request did not see a clinical
> indication to schedule him for further evaluation. I also deny the allegation that
> staff members have told him that my reason for preventing him from receiving
> medical treatment is "that it won't be documented for any future civil action." I
> have no concerns about how many future civil actions Mr. McCue files that may
> involve me as I am responsible to ensure ADEQUATE medical and dental
> services are provided to the inmate population at Tamms and that is what I do.

(Doc. 1-3 at 1).

Plaintiff alleges that on February 10, 2005, although he had been denied sick call, he was

fortunate enough to catch Dr. J. Chhabra making a night round (Doc. 1 at ¶ 18). Dr. J. Chhabra,

M.D., did see Plaintiff on February 10, 2005, at 7:00 p.m., noting that Plaintiff complained of

"mouth ulcers and pains on chewing due to problems with denture." (Doc. 1-5 at 16). Dr.

Chhabra further indicates that Plaintiff had oral ulcers and prescribed Prescription Orajel (Doc.

1-5 at 16; Doc. 1 at ¶ 18).

On February 14, 2005, Plaintiff was granted what he characterizes as an emergency

dental appointment with Defendant Aldridge (Doc. 1 at ¶ 19; Doc. 1-3 at 12). Defendant

Aldridge's treatment notes indicate that Plaintiff was referred from the nurses for "sore gums,"

and Defendant Aldridge admits the same (Doc. 1-3 at 12; Doc. 32 at ¶ 59). Defendant Aldridge

noted that Plaintiff's gum tissue was sore and did have some trauma caused by the bottom teeth

hitting against it (Doc. 1-3 at 12; Doc. 32 at ¶ 59). There is no treatment indicated in the

treatment note, except a statement that Plaintiff is getting new denture (Doc. 1-3 at 12). But,

Defendant Aldridge did order a soft diet for Plaintiff that day (Doc. 32 at ¶ 60).  Dr. Aldridge

claims that he was not aware of any treatment of Plaintiff's gums prior to this date (Doc. 32 at ¶

66).

Plaintiff claims that during this visit he requested a rubber mouth guard, a soft diet, and

his medication to control the pain (Doc. 1-3 at 5).  According to Plaintiff, Defendant Aldridge

acknowledged that his gums were swollen and bleeding, and said he would order a soft diet and

also talk to Dr. Powers about giving him Oragel to help with the pain (Doc. 1-3 at 5).  But

Plaintiff asserts that Defendant Aldridge refused to provide him with a cheap generic mouth

guard to protect his gums from further trauma, and also states that he did not know how much

longer it would take to get his denture because he was only finished with the second stage of a

five-stage process to make the denture (Doc. 1-3 at 5-6).  Defendant Aldridge states that he does

not believe that a mouth guard could be made for Plaintiff (Doc. 32 at ¶ 68).

On February 15, 2005, Plaintiff filed a grievance detailing his visit with Dr. Aldridge on

February 14, 2005, requesting that he be provided with a rubber mouth guard immediately.  On

March 8, 2005, a response was provided by Defendant Caliper, in which she stated as follows:

> Inmate McCue's denture has been received from the dental laboratory and he is
> scheduled for an appointment with Dr. Aldridge.  A dental soft diet was ordered
> on February 14, 2005.  In terms of the rubber mouth guard request, if Dr.
> Aldridge felt it was clinically indicated, he would have ordered it.  There is no
> order for inmate McCue to be issued Ora-gel as needed.

(Doc. 1-3 at 5).  Plaintiff's grievance was denied.

On March 23, 2005, Plaintiff saw Defendant Aldridge for a bite registration as part of the

process to replace his denture (Doc. 1-3 at 12).

On April 25, 2005, Plaintiff sent two identical resident requests, one to Defendant

Aldridge, and the other to Defendant Caliper (Doc. 1-4 at 9).  The request stated, "This is my

third request.  Why was I taken off of the dental soft diet when nothing has changed with my dental problems?  I haven't had an upper denture since April 2004, and you know this.  Please reply." (Doc. 1-4 at 9).  Attached to the Motion for Summary Judgment (Doc. 32) were records indicating that Dr. Aldridge ordered a soft diet for Plaintiff on February 14, 2005 to March 14, 2005, from March 14, 2005, to March 28, 2005, and from April 27, 2005 to May 27, 2005 (Doc. 32-7 at 11-13).  Although Defendant Aldridge claims that he ordered a soft diet also in "early April 2005," there was no documentation provided to the Court to support this claim, and it appears that Plaintiff may not have been provided a soft diet from March 29, 2005, to April 26, 2005.  Defendant Aldridge states that if Plaintiff wanted to renew his soft diet, he need only have come back to see either him or Dr. Powers to do so (Doc. 32 ¶ 83).

On May 18, 2005, Plaintiff saw Defendant Aldridge again relating to the creation of a new denture (Doc. 1-3 at 12).  Defendant Aldridge's treatment note indicates "send to lab to finish." (Doc. 1-3 at 12).

On June 6, 2005, Plaintiff states that he finally received his denture, fourteen months after he initially requested a replacement (Doc. 1 at ¶ 20).  Defendant Aldridge's treatment note indicates that Plaintiff was seen on June 6, 2005 (Doc. 1-3 at 12).

Defendant Aldridge claims that there are five steps in making dentures and that on average it takes twenty (20) weeks to complete the process (Doc. 32 at ¶¶ 51-52).  It is undisputed that the process took approximately fifty-seven (57) weeks from the time the first impression was taken on April 28, 2004, until the denture was completed and delivered on June 6, 2005.

**CONCLUSIONS OF LAW**

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment is proper only if it is demonstrated "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Haefling v. United Parcel Service, Inc., 169 F.3d 494, 497 (7th Cir. 1999); Dempsey v. Atchison, Topeka and Santa Fe Railway Company, 16 F.3d 832, 836 (7th Cir. 1994). The burden is upon the moving party to establish that no material facts are in genuine dispute, and any doubt as to the existence of a genuine issue must be resolved against the moving party. Adickes v. S.H. Kress & Co., 398 U.S. 144, 160 (1970); Miller v. Borden, Inc., 168 F.3d 308, 312 (7th Cir. 1999). A fact is material if it is outcome determinative under applicable law. Hardin v. S.C. Johnson & Son, Inc., 167 F.3d 340, 344 (7th Cir. 1999); Smith v. Severn, 29 F.3d 419, 427 (7th Cir. 1997); Estate of Stevens v. City of Green Bay, 105 F.3d 1169, 1173 (7th Cir. 1997).

Even if the facts are not in dispute, summary judgment is inappropriate when the information before the court reveals a good faith dispute as to inferences to be drawn from those facts. Plair v. E.J. Brach & Sons, Incorporated, 105 F.3d 343, 346 (7th Cir. 1997); Lawshe v. Simpson, 16 F.3d 1475, 1478 (7th Cir. 1994); Dempsey, 16 F.3d at 836. Finally, summary judgment "will not be defeated simply because motive or intent are involved." Roger v. Yellow Freight Systems, Inc., 21 F.3d 146, 148 (7th Cir. 1994). See also, Miller, 168 F.3d at 312; Plair, 105 F.3d at 347; Hong v. Children's Memorial Hospital, 993 F.2d 1257, 1261 (7th Cir. 1993); Lac Du Flambeau Indians v. Stop Treaty Abuse-Wisconsin, Inc., 991 F.2d 1249, 1258 (7th Cir. 1993).

In deciding a motion for summary judgment, the trial court must determine whether the evidence presented by the party opposed to the summary judgment is such that a reasonable jury might find in favor of that party after a trial.

> The inquiry performed is the threshold inquiry of determining whether there is the need for a trial--whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.
>
> [T]his standard mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict.

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).  See also, Celotex Corporation v. Catrett, 477 U.S. 317, 322-23 (1986); Haefling, 169 F.3d at 497-98; Sybron Transition Corporation v. Security Insurance Company of Hartford, 107 F.3d 1250, 1255 (7th Cir. 1997); Weinberger v. State of Wisconsin, 105 F.3d 1182, 1188 (7th Cir. 1997).

**Deliberate Indifference to Serious Medical Need**

The Supreme Court has recognized that "deliberate indifference to serious medical needs of prisoners" may constitute cruel and unusual punishment under the Eighth Amendment. Estelle v. Gamble, 429 U.S. 97, 104 (1976); Farmer v. Brennan, 511 U.S. 825 (1994).  This encompasses a broader range of conduct than intentional denial of necessary medical treatment, but it stops short of "negligen[ce] in diagnosing or treating a medical condition." Estelle, 429 U.S. at 106. See also Jones v. Simek, 193 F.3d 485, 489 (7th Cir. 1999); Steele v. Choi, 82 F.3d 175, 178 (7th Cir. 1996), cert. denied, 519 U.S. 897 (1996).

> A prisoner raising an Eighth Amendment claim against a prison official therefore must satisfy two requirements. The first one is an objective standard: "[T]he deprivation alleged must be, objectively, 'sufficiently serious.'" Farmer, 511 U.S. at [834], 114 S.Ct. at 1977. As the Court explained in Farmer, "a prison official's act or omission must result in the denial of the minimal civilized measure of life's

necessities." Id. The second requirement is a subjective one: "[A] prison official must have a 'sufficiently culpable state of mind,'" one that the Court has defined as "deliberate indifference." Id; see Hudson v. McMillian, 503 U.S. 1, 5, 112 S.Ct. 995, 998, 117 L.Ed.2d 156 (1992) ("[T]he appropriate inquiry when an inmate alleges that prison officials failed to attend to serious medical needs is whether the officials exhibited 'deliberate indifference.'"); Estelle v. Gamble, 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976) ("[D]eliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain.'").

Vance v. Peters, 97 F.3d 987, 991-992 (7th Cir. 1996), cert. denied, 520 U.S. 1230 (1997).

However, the Supreme Court stressed that this test is not an insurmountable hurdle for inmates raising Eighth Amendment claims:

[A]n Eighth Amendment claimant need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm.... Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, . . . and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.

Farmer, 511 U.S. at 842.

The Seventh Circuit's decisions following this standard for deliberate indifference in the denial or delay of medical care require evidence of a defendant's actual knowledge of, or reckless disregard for, a substantial risk of harm. The Circuit also recognizes that a defendant's inadvertent error, negligence, or even ordinary malpractice is insufficient to rise to the level of an Eighth Amendment constitutional violation.

Neglect of a prisoner's health becomes a violation of the Eighth Amendment only if the prison official named as defendant is deliberately indifferent to the prisoner's health--that is, only if he 'knows of and disregards an excessive risk to inmate health or safety.

Williams v. O'Leary, 55 F.3d 320, 324 (7th Cir.), cert. denied, 516 U.S. 993 (1995); see also Steele, 82 F.3d at 179 (concluding there was insufficient evidence of doctor's knowledge of

serious medical risk or of his deliberate indifference to that risk; emphasizing that even malpractice is not enough proof under <u>Farmer</u>); <u>Miller v. Neathery</u>, 52 F.3d 634, 638-39 (7th Cir. 1995) (applying <u>Farmer</u> mandate in jury instruction). However, a plaintiff inmate need not prove that a defendant intended the harm that ultimately transpired or believed the harm would occur. <u>Haley v. Gross</u>, 86 F.3d 630, 641 (7th Cir. 1996).

The Seventh Circuit has recognized that dental care is "one of the most important medical needs of inmates." <u>See</u> <u>Wynn v. Southward</u>, 251 F.3d 588, 593 (7th Cir. 2001). Furthermore, allegations that an inmate who is denied his dentures and cannot chew his food, and suffers bleeding, headaches, and disfigurement, states a serious medical need. <u>Id.</u>

<u>Defendant Aldridge</u>

The Motion for Summary Judgment (Doc. 32), filed by Defendant Aldridge, along with his Memorandum of Law in Support (Doc. 33), alleges that judgment as a matter of law is appropriate on Plaintiff's deliberate indifference claim because "[t]here is no evidence in this case to establish that Defendant Aldridge acted with deliberate indifference to Plaintiff's dental needs." (Doc. 32 at 11; Doc. 33 at 2).

Mores specifically, Defendant Aldridge first attacks the first prong of the standard for a finding of deliberate indifference; that is, that the deprivation alleged is objectively "sufficiently serious" such that the prison official's act or omission results in the denial of the "minimal civilized measure of life's necessities." <u>Farmer</u>, 511 U.S. at 834. He does this by claiming that Plaintiff has failed to allege a serious medical need (Doc. 33 at 4).

As dental care is "one of the most important medical needs of inmates," <u>Wynn</u>, 251 F.3d at 593, Plaintiff's allegations that he suffered from painful, sore, swollen, infected, bleeding, and disfigured gums as a result Defendant Aldridge's delay and refusal to treat his condition, states a

serious medical need. See Id. While Defendant Aldridge disputes the extent and cause of Plaintiff's injuries, he does admit that Plaintiff suffered trauma to his gums as a result of contact with his lower teeth (Doc. 1-3 at 12; Doc. 32 at ¶ 59). Plaintiff has also provided numerous grievances and affidavits that support his claims of injury. As any doubt as to the existence of a genuine issue must be resolved against the moving party, Adickes, 398 U.S at 160, we must accept Plaintiff's claims of injury as true. Therefore, there is no doubt that Plaintiff has alleged a serious medical need.

Defendant Aldridge next argues that Plaintiff fails to provide any evidence that he acted with deliberate indifference to Plaintiff's serious dental needs. The Court takes this as an attack on the second prong of an Eighth Amendment claim of deliberate indifference, which requires that the prison official have a "sufficiently culpable state of mind." Farmer, 511 U.S. at 834. This is a question of fact, which is present if "the official acted or failed to act despite his knowledge of a substantial risk of serious harm . . ." Id. at 842. If the risk of harm was obvious, a factfinder may conclude that the prison official knew of a substantial risk. Id.

In this case, if Plaintiff has produced enough evidence in response to Defendant Aldridge's summary judgment motion such that the factfinder could reasonably conclude that Defendant Aldridge knew that his actions created a substantial risk of serious harm to Plaintiff, then summary judgment must be denied. Plaintiff alleges that Defendant Aldridge was deliberately indifferent by (1) refusing to provide him a new denture until he signed a payment voucher for approximately seventy-one dollars, (2) causing excessive delays in getting him a replacement denture, (3) refusing to provide him with a rubber mouth guard to protect his gums until a new denture was provided, and (4) refusing to put and keep him on a soft diet until he received his denture (Doc. 1, ¶ 32). For the specific reasons that follow, this Court finds that

material questions of fact exist concerning each of Plaintiff's bases for his claim that Defendant Aldridge was deliberately indifferent.

It is undisputed that Defendant Aldridge refused to provide a new denture to Plaintiff until Plaintiff paid the lab fee associated with the procedure. It was not until April 28, 2004, that Defendant Aldridge first refused further treatment to Plaintiff unless and until he signed the voucher form; that is, when Defendant Aldridge decided that Plaintiff was not to be scheduled to be seen again to complete the process of obtaining dentures until he agreed to pay. It is Defendant Aldridge's contention that he was unaware of any problems with Plaintiff's gums until February 14, 2005, when he was referred from the nurses (Doc. 32 at ¶ 16).

Plaintiff's sworn testimony alleges, however, that that during his biannual exam on May 5, 2004,[1] he explained to Defendant Aldridge that he wanted a soft diet and a rubber mouth guard because, due to his denture becoming totally unusable, he was grinding his bottom teeth into his upper gums at night, resulting in sore, swollen, and bleeding gums. (Doc. 1 at ¶ 11). Plaintiff's allegation constitutes a disputed issue of material fact which, if true, would be sufficient for a factfinder to reasonably conclude that Defendant Aldridge knew that refusing to treat Plaintiff until he paid for the procedure created a substantial risk of serious harm to Plaintiff, regardless of what the administrative directives stated regarding payment. It was well established at the time that if a government entity can obtain medical treatment necessary for a prisoner only by paying for it, then it must pay. See City of Revere v. Massachusetts General Hosp., 463 U.S. 239, 245 (1983).

---

[1] Plaintiff's Complaint, Paragraph 11, lists the date "5/5/05" rather than "5/5/04", but it appears from the context of the surrounding paragraphs, and Exhibit 10 to Plaintiff's Complaint (Doc. 1-3 at 12), that the date was actually May 5, 2004, as Plaintiff's dental records record a visit on May 5, 2004, but not May 5, 2005.

A factfinder could also reasonably conclude that Defendant Aldridge knew that the delay Plaintiff endured to get a new denture would cause a substantial risk of serious harm to Plaintiff. Although Dr. Aldridge states that making dentures involves a five-step process in which the average amount of time to complete this process is twenty (20) weeks (Doc. 32 at ¶¶ 51-52), it is undisputed that the process to make Plaintiff's new denture was started on April 28, 2004,[2] but not completed until May of 2005, approximately fifty-seven (57) weeks later (Doc. 32 at ¶ 62). Plaintiff disputes that it actually takes twenty weeks to create a new denture, based on the time it took to create his first set of dentures and because he asserts that Dr. Aldridge told him initially that it would only take a couple of months to make new dentures for him (Doc. 37-4 at 18).

Plaintiff claims that he notified Defendant Aldridge of the problems to his gums as early as May 5, 2004. Although this is a disputed issue of fact, for the purposes of summary judgment, any doubt as to the existence of a genuine issue must be resolved against Defendant Aldridge, as he is the moving party. In addition to his sworn statement that he notified Defendant Aldridge of his gum issues at the May 5, 2004, visit, Plaintiff also filled out a resident request addressed to Defendant Aldridge and dated September 1, 2004, stating that he was willing to pay the lab fee and advising about the trauma to his gums resulting from not having a wearable denture during the previous four months (Doc. 1-4 at 5). Despite this notice, Plaintiff was not seen by Defendant Aldridge for several months until seen on November 8, 2004. Moreover, the process to make a new denture did not resumed until December 27, 2004, some eight months after the process was started, because Defendant Aldridge chose to verify that Plaintiff had enough money in his prison account to cover the associated fee. Plaintiff has adequately demonstrated that there

_____

[2] Defendant Aldridge stated as undisputed material fact that on April 28, 2006, an impression was made of Plaintiff's upper gums (Doc. 32 at ¶ 48). This date appears to be a typographical error. The Court finds that actual date was April 28, 2004, as indicated in Plaintiff's dental record (Doc. 1-3 at 12).

exists a genuine issue of material fact regarding whether the length of time it took for Defendant Aldridge to provide Plaintiff with a replacement denture constituted deliberate indifference.

A question of material fact also remains regarding whether Defendant Aldridge was deliberately indifferent by refusing to provided Plaintiff with a rubber mouth guard to protect his gums from the trauma that resulted when his bottom teeth grinded against his upper gums. Although Defendant Aldridge admits that he was aware of the trauma caused to Plaintiff's gums as of February 14, 2005, he claims he acted appropriately in refusing to provide a rubber mouth guard for Plaintiff to wear at night. Defendant Aldridge states, "In response to Plaintiff's request for a mouth guard, Dr. Aldridge does not believe that a mouth guard could be made in this situation . . . because mouth guards are made for people with their teeth, not someone with a denture." (Doc. 32 at ¶¶ 68-69). The Court finds Defendant Aldridge's contention untenable. A layperson with no medical training whatsoever knows that a generic rubber mouth guard could have been provided to protect Plaintiff from grinding his bottom teeth into his upper gum at night. Even if this Court were to pretend that such generic rubber mouth guards, which are widely available and used in sports and athletics, do not exist, the Court does not understand why such a mouth guard would not have been created to fit Plaintiff's bottom teeth. In any case, a factfinder could reasonably conclude that Defendant Aldridge knew that refusing to provide a generic rubber mouth guard created a substantial risk of serious harm to Plaintiff.

Finally, Defendant Aldridge argues that summary judgment is appropriate despite Plaintiff's claim that Defendant Aldridge refused initially to put him on a soft diet, and then discontinued the soft diet, knowing it would cause serious harm to Plaintiff. In Defendant Aldridge's Motion for Summary Judgment (Doc. 32), he states that Plaintiff "was given orders for a therapeutic diet by Dr. Aldridge on February 14, 2005; March 14, 2005; **early April 2005**;

and April 27, 2005. (See orders for therapeutic diets attached hereto as Group Exhibit 6.)." (Doc. 32 at ¶ 82) (emphasis added).

First, the Court must note that although Defendant Aldridge provides documentation to support ordering Plaintiff a soft diet for the periods of February 14, 2005, to March 14, 2005; from March 14, 2005, to March 28, 2005; and from April 27, 2005 to May 27, 2005, he fails to provide any documentation to support his allegation that he ordered a soft diet in "early April 2005." (Doc. 32-7 at 11-13). The February 14, 2005 request was to terminate after thirty days, as did the April 27, 2005 request. However, the March 14, 2005 request stated it was to terminate after only fourteen days. A reasonable inference could be drawn that Plaintiff was not provided a soft diet from March 29, 2005, to April 13, 2005. This is especially true given Plaintiff's resident requests dated April 25, 2005, which stated that this was his third request asking why he was taken off of his soft diet when nothing had changed (Doc. 1-4 at 9). A reasonable factfinder could conclude that Defendant Aldridge did not provide Plaintiff with a soft diet for at least part of the period claimed by Plaintiff, and that Defendant Aldridge knew that this created a substantial risk of serious harm to Plaintiff.

While Defendant Aldridge claims, "If Mr. McCue wanted to renew his soft diet, he need only to come back to see either Dr. Aldridge or Dr. Powers to do so." (Doc. 32 at ¶ 83). The record demonstrates that Plaintiff did attempt to do just that, but was unsuccessful at doing so for almost a month.

Given that Defendant Aldridge has failed to show that the undisputed facts demonstrate that no reasonable jury could find that he was deliberately indifferent to Plaintiff's serious medical needs, it is **RECOMMENDED** that summary judgment be **DENIED** to Defendant Aldridge on Plaintiff's deliberate indifference claim.

<u>Defendant Elyea</u>

In Defendant Elyea's Motion for Summary Judgment (Doc. 37), he argues that he had no involvement in Plaintiff's actual treatment, and that the only evidence of his involvement is in regard to the decision to require Plaintiff to pay for his new denture (Doc. 37 at 8).

It appears that Defendant Elyea only challenges Plaintiff's claim of deliberate indifference on the ground that lawsuits against individuals under § 1983 require personal involvement in the alleged constitutional deprivation to support a viable claim. <u>Palmer v. Marion County</u>, 327 F.3d 588, 594 (7th Cir. 2003). "Individual liability under 42 U.S.C. § 1983 can only be based on a finding that the defendant caused the deprivation at issue." <u>Kelly v. Mun. Courts of Marion County</u>, 97 F.3d 902, 909 (7th Cir.1996). Although direct participation is not necessary, there must at least be a showing that the defendant acquiesced in some demonstrable way in the alleged constitutional violation. <u>Palmer</u>, 327 F.3d at 588 (citing <u>Kelly</u>, 97 F.3d at 909; <u>Rascon v. Hardiman</u>, 803 F.2d 269, 274 (7th Cir.1986)). Therefore, if Plaintiff has failed to show that Defendant Elyea was personally involved with the alleged deliberate indifference to his serious medical need, then summary judgment in favor of Defendant Elyea must be granted.

Plaintiff has met his burden, however, in showing that Defendant Elyea was personally involved in the alleged deprivation. Plaintiff produced a series of e-mail exchanges from Defendant Elyea that create a genuine issue of material fact regarding whether Defendant Elyea was deliberately indifferent to Plaintiff's serious medical need (Doc. 1-5 at 6). Defendant Elyea's own words, present in the e-mail, indicate that he spoke directly with Plaintiff's dentist, Defendant Aldridge, about whether to go forward with or delay Plaintiff's treatment: "I spoke directly with Dr. Aldridge . . . . [Plaintiff] will be provided with a repaired or replaced denture if and when [he] signs his voucher for payment." (Doc. 1-5 at 6). Further, by stating, "The

offender will be provided with a repaired or replaced denture if and when the offender signs his voucher for payment," Defendant Elyea shows that he was personally involved in the deprivation, since it appears that but for Defendant Elyea overruling Dr. Powers, Plaintiff would have been provided dentures without charge (Doc. 1-5 at 6).

A reasonable jury could conclude that Defendant Elyea had the requisite knowledge of a substantial risk of serious harm to Plaintiff if he was denied a replacement denture either because he refuse to sign the voucher or because he did not have the required amount of money in his prison account. Defendant Elyea's statement that Plaintiff would be provided with a repaired or replaced denture "if and when" he signed the voucher for payment, could be taken to demonstrate that he might not receive a repair or replacement (the "if"), but that that he would probably consent given the need for the denture (the "when"). Also, the apparent disagreement among the staff regarding whether Plaintiff should be provided the denture immediately at no charge, along with Defendant Elyea's statement that "[o]nce you pay for one, you place the entire department in a precarious position," is further evidence that the factfinder could use to infer deliberate indifference by Defendant Elyea.

A material question of fact therefore exists regarding both the extent of Defendant Elyea's involvement in Plaintiff's treatment and whether his denial of Plaintiff's medical care until such time as Plaintiff signed the payment voucher constituted deliberate indifference to a serious medical need. Summary judgment is not appropriate in Defendant Elyea's favor based on his argument that there is no evidence to suggest he had any personal involvement in Plaintiff's treatment. Accordingly, it is **RECOMMENDED** that summary judgment be **DENIED** to Defendant Elyea on Plaintiff's deliberate indifference claim.

<u>Defendant Caliper</u>

In Defendant Caliper's Motion for Summary Judgment (Doc. 37), she also argues that summary judgment is appropriate in her favor on Plaintiff's deliberate indifference claim because she did not have any personal involvement in Plaintiff's treatment. Defendant Caliper states that although she is a registered nurse, she is a prison administrator who does not have the authority to prescribe treatment for the inmates (Doc. 37 at 8). She further argues that she was unable to override Defendant Aldridge's determination that a rubber mouth guard should not be prescribed and also that she did not have the authority to order a soft diet for Plaintiff (Doc. 37 at 8).

Defendant Caliper's request for summary judgment must be denied. Plaintiff provides multiple grievance reports that support his allegation that Defendant Caliper ordered that Plaintiff not be allowed to be seen by a doctor for his bleeding gums (Doc. 1-2 at 14-15; Doc. 1-3 at 1). In one of these grievances, dated February 7, 2005, Plaintiff states:

> I was just told tonight 2/7/05, at 8:20 p.m., by Nurse Lynn Stokes, that even though I put in for sick call regarding these medical problems that Ms. T. Caliper, HCA, stated that I am not to be seen for this serious problem. She also said, the dentist said I have a denture that I can use which is a lie and he knows it. I showed my broken denture to Ms. L. Stokes and c/o Walker. Now my upper gums have been sore, swollen and even bleeding at times over the past ten months that I have been forced to eat and go without a denture. I also grind my bottom 6 real teeth to my upper gum while sleeping which causes bleeding.

(Doc. 1-2 at 14). The grievance was denied. However, Defendant Caliper provided a response on February 14, 2005. In that response, she did not deny that she had ordered Plaintiff not to be seen for the trauma afflicting his gums, but did state as follows:

> An impression for a partial denture was taken on December 27, 2004 and sent to the dental lab for a denture to be made. Dr. Aldridge has been consulted and did not see a clinical indication to order Mr. McCue a special diet. I will ensure inmate McCue is given his new partial when received. In terms of his request to

be seen by the physician for "gums" he has received an over-the-counter
preparation, Oragel.

(Doc. 1-2 at 14).  Plaintiff admits receiving Oragel from Dr. Chhabra after the time he submitted

his grievance, but states that this was only because he happened to catch Dr. Chhabra making a

night round—not because Defendant Caliper allowed him to be seen.  Plaintiff wrote a response

to the grievance, stating that he would like to know who gave Defendant Caliper the authority to

deny him the right to be seen by a nurse at sick call without examining him first (Doc. 1-2 at 15).

On a grievance dated February 9, 2005, Plaintiff states that he asked Nurse K.

Ksasniewski to go to sick call for his bleeding gums (Doc. 1-3 at 1). Plaintiff also states that Ms.

Ksasniewski then called Defendant Caliper and told Plaintiff that she could not help him because

Defendant Caliper refused to let him be seen at sick call (Doc. 1-3 at 1).  Plaintiff then states in

the grievance that "I've heard from staff members that Ms. Caliper's reasoning for denying me

this necessary medical treatment for my gums etc. is so that it won't be documented for any

future Civil Action against her and Dr. S. Aldridge for denying me a denture for the past ten

months."  He then requested to be seen by a doctor for his bleeding gums.

Although Plaintiff's grievance was denied, Defendant Caliper submitted a written

response to Plaintiff's request stating:

> I deny the allegation.  My only role in processing inmate request for medical
> services is to review the request, note the date it was received and refer to the
> nursing staff for screening.  I received a request from McCue on 2/7/05.  It was
> referred to the 3011 shift and the nurse screening the request did not see a clinical
> indication to schedule him for further evaluation.  I also deny the allegation that
> staff members have told him that my reason for preventing him from receiving
> medical treatment is "that it won't be documented for any future civil action."  I
> have no concerns about how many future civil actions Mr. McCue files that may
> involve me as I am responsible to ensure ADEQUATE medical and dental
> services are provided to the inmate population at Tamms and that is what I do.

(Doc. 1-3 at 1).

Plaintiff's allegation as contained in these grievances state a material question of fact regarding whether Defendant Caliper was deliberately indifferent to Plaintiff's serious medical needs by refusing to allow him to be seen by either a nurse during sick call or by a doctor. As the Health Care Administrator, Defendant Caliper surely had the authority to see that Plaintiff was seen by a doctor. Defendant Caliper's alleged order to deny Plaintiff access to medical care, if true, constitutes a direct involvement in Plaintiff's medical care. Therefore, it is **RECOMMENDED** that Defendant Caliper be **DENIED** summary judgment on Plaintiff's deliberate indifference claim.

**Retaliation for Filing Grievances**

In order to prove a retaliation claim Plaintiff must prove that (1) the employee's speech was constitutionally protected, and (2) the speech was a substantial or motivating factor in the retaliatory action. Spiegla v. Hull, 371 F.3d 928, 935 (7th Cir. 2004). If and when the plaintiff proves these two elements, the defendant can still avoid liability by establishing that the same action would have been taken in the absence of the plaintiff's protected speech. Id.

It is well established that "Penalizing a prisoner's exercise of the constitutional right to petition for redress of grievances is a constitutional tort." Simpson v. Nickel, 450 F.3d 303, 305 (7th Cir. 2006). "An act taken in retaliation for the exercise of a constitutionally protected right violates the Constitution. Prisoners have a constitutional right of access to the courts that, by necessity, includes the right to pursue the administrative remedies that must be exhausted before a prisoner can seek relief in court." DeWalt v. Carter, 224 F.3d 607, 618 (7th Cir. 2000) (citations omitted). "Thus, a prison official may not retaliate against a prisoner because that prisoner filed a grievance . . . . This is so even if the adverse action does not independently

violate the Constitution." Id.; See also Walker v. Thompson, 288 F.3d 1005, 1009 (7th Cir. 2002).

While it is possible in some instances to prove retaliation through direct written evidence, see, e.g., Buise v. Hudkins, 584 F.2d 223, 226 (7th Cir. 1978), in most instances it is not possible to do so, and instead retaliation must be proved through circumstantial evidence. See Murphy v. Lane, 833 F.2d 106, 108 (7th Cir. 1987) ("[T]he ultimate fact of retaliation for the exercise of a constitutionally protected right rarely can be supported with direct evidence of intent[.]"). "[R]etaliation may plausibly be inferred" from "a chronology of events." Cain v. Lane, 857 F.2d 1139, 1143 n.6 (7th Cir. 1988). See also Benson v. Cady, 761 F.2d 335, 342 (7th Cir. 1985). In short, to prove retaliation, a plaintiff must show that his or her constitutionally-protected conduct was a substantial or motivating factor in a state actor's decision and that the same decision would not have been reached absent the protected conduct. See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977); Spiegla, 371 F.3d at 941.

Defendant Aldridge

Defendant Aldridge asserts in his Motion for Summary Judgment (Doc. 32), that Plaintiff has no evidence to (1) support a finding that Defendant Aldridge "was ever aware that Plaintiff had filed a grievance against him or anyone else concerning his dentures" (Doc. 32 at 11), (2) support a finding that a different outcome would have occurred had he not filed a grievance, and (3) support his claims of retaliation. Defendant Aldridge further asserts that Plaintiff has failed to indicate specifically what he believes Defendant Aldridge did in response to the filing of any grievance which resulted in his alleged delay (Doc. 32 at 11). Plaintiff responds that the evidence in this case demonstrates a sufficient chronology of events from which a reasonably

jury could infer retaliation (Doc. 55). This Court agrees, but will first address some of Defendant Aldridge's proposed reasons for granting summary judgment.

Although Defendant Aldridge claims that Plaintiff has no evidence to support a finding that Defendant Aldridge was aware that Plaintiff had filed any grievance regarding his dentures, the evidence shows otherwise. In his response to Defendant Aldridge's Motion for Summary Judgment (Doc. 32), Plaintiff attached a resident request dated April 28, 2004, and addressed to Dr. Powers, in which Plaintiff relays his suspicion that Defendant Aldridge may be double billing for dentures, stating that something is not right (Doc. 47 at 10). Dr. Powers responded to Plaintiff by stating that he had talked with Dr. Aldridge and that the dentures would be forthcoming and that since the broken denture is approximately fifteen years old, Plaintiff should not be charged the seventy-one dollars that Dr. Aldridge had told him he would have to pay for a replacement denture (Doc. 47 at 10). This is just one example.

Plaintiff also attaches a series of e-mails dated July 1, 2004, quoted in the previous section of this report and recommendation, in which Dr. Elyea states that concerning Defendant's allegations, he spoke directly with Dr. Aldridge regarding his compliance with the administrative directives with regarding whether Plaintiff should be charged for his dentures. In fact, in Dr. Aldridge's deposition, he states: "I got a phone call from Dr. Elyea, and he read to me something that McCue had turned in to I believe it was the comptroller, and he asked me what was going on . . ." (Doc. 32-4 at 3). Further, when asked if Dr. Elyea read to him what Plaintiff had written to the comptroller, Defendant Aldridge stated "I can't remember word for word, but in – basically he was saying that I was double-charging them and basically had some kind of a scam going on." (Doc. 32-4 at 3). It baffles the Court to understand how this does not constitute

evidence that Defendant Aldridge was aware that Plaintiff had filed grievances concerning his dentures.

The Court also disagrees with Defendant Aldridge's assertion that there is no evidence to suggest that his actions would have been different if Plaintiff had not filed any grievances. Defendant Aldridge himself states that the average amount of time to complete the process involved in making dentures is twenty (20) weeks (Doc. 32 at ¶ 52). However, it is undisputed that the process to make Plaintiff's new denture took much longer than that. This difference cuts in Plaintiff's favor because after Plaintiff filed grievances complaining about Defendant Aldridge, his process took substantially longer than the twenty weeks Defendant Aldridge states is the norm.

With regard to Defendant Aldridge's argument that Plaintiff has provided no evidence that he retaliated against Plaintiff, the most direct evidence is Plaintiff's sworn statement in his complaint claiming that during a visit with Defendant Aldridge on July 21, 2004, Defendant Aldridge stated that he did not care about the response to one of Plaintiff's grievances which stated that he only was to be charged a two-dollar co-pay amount for his denture replacement, because now he would have to pay for writing to Comptroller Hynes (Doc. 1 at ¶ 13). Plaintiff's statement, if believed, would constitute direct evidence of retaliation by Dr. Aldridge for Plaintiff's exercise of a constitutional right.

The Court is mindful that it is not sitting as the trier of fact, and that the evidence submitted by Plaintiff and Defendant Aldridge raise issues about credibility and intent that the Court cannot resolve in ruling on a motion for summary judgment. "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249.

"While Rule 56 does contemplate that . . . the allegations of fact in the pleadings may be pierced . . . by admissions, depositions and affidavits which show, in fact, that no genuine issues of fact exist . . . , the court . . . is not permitted to try on the affidavits submitted an issue of fact which is presented by the pleadings." Zahora v. Harnischfeger Corp., 404 F.2d 172, 175 (7th Cir. 1968). Put another way, "summary judgment is inappropriate when affidavits require credibility determinations," and "where the underlying issue is one of motivation, intent, or some other subjective fact." Santiago v. Lane, 894 F.2d 218, 224 (7th Cir.1990) (citing Davis v. Zahradnick, 600 F.2d 458 (4th Cir. 1979), and Conner v. Reinhard, 847 F.2d 384 (7th Cir. 1988)). See also Smith v. Maschner, 899 F.2d 940, 949 (10th Cir. 1990) ("Where defendants' motives are seriously at issue, trial by affidavit is particularly inappropriate"; credibility determinations and the weighing of evidence is for the jury).

Here, for the Court to grant summary judgment to Defendant Aldridge on Plaintiff's retaliation claim, it would have to make a determination that Plaintiff's claim that Defendant Aldridge told him that he would have to pay for writing to Comptroller Hynes is not credible. It is inappropriate for the Court to make such a determination, as credibility determinations are best left to the province of the trier of fact. Accordingly, it is **RECOMMENDED** that summary judgment be **DENIED** as to Defendant Aldridge on Plaintiff's retaliation claim.

Defendant Elyea

In Defendant Elyea's Motion for Summary Judgment (Doc. 37), he argues that he is entitled to summary judgment on Plaintiff's retaliation claim because (1) he was not involved in any decision not to provide Plaintiff a rubber mouth guard or soft diet, (2) there is no evidence that he denied Plaintiff sick call, and (3) Plaintiff was provided access to medical staff during the relevant time frame (Doc. 37 at 9).

Regardless of whether these statements are true, Defendant Elyea is not entitled to judgment as a matter of law. Plaintiff engaged in constitutionally protected speech when, on May 30, 2004, Plaintiff sent a letter complaining about Dr. Aldridge's billing practices to the Comptroller of Illinois (Doc. 1-4 at 1). Plaintiff claims that it was because he wrote this letter, along with his various other grievances regarding his medical treatment, that he was denied replacement dentures unless and until he had the money to pay for them and consented to such payment. If there is sufficient evidence such that the factfinder could reasonably conclude that Plaintiff's complaints were a substantial or motivating factor behind this action, then summary judgment must be denied. Spiegla, 371 F.3d at 935.

On July 1, 2004, Defendant Elyea authored several e-mails, quoted verbatim above, that indicate that he had spoken directly with Dr. Aldridge about whether Plaintiff's dentures should be repaired or replaced if Plaintiff failed to sign a voucher and provide payment for the procedure (Doc. 1-5 at 6). In that e-mail, Defendant Elyea concludes that despite Dr. Power's belief that Plaintiff should not be charged for a new denture, the administrative directives support a finding that Plaintiff must pay for any repair or replacement where the state provided him with the original denture (Doc. 1-5 at 6). The Court was not, however, provided with a citation to, or copy of, any such administrative directive stating what Defendant Elyea claims in his e-mail. The only administrative directive referenced in the record is A.D. 04.03.102 Dental Care for Offenders, to which the Court was provided a copy by Defendant Elyea (Doc. 37-3 at 27-34). In response to several of Plaintiff's grievances (Doc. 1-2 at 10; Doc. 1-2 at 4), Defendant Caliper cited section II(6)(b), which reads:

> Offenders who have lost or broken a dental prosthetic through negligence shall be required to pay the dental laboratory fee for replacement. The offender shall be required to sign a Request for Payment, DC 828, authorizing the deduction of the payment from present or future funds in his trust fund account. The time frame

> for replacement shall be according to priority and availability as determined by
> the dentist.

(Doc. 37-3 at 30). The response to Plaintiff's October 12, 2004 grievance, Defendant Caliper

cited this section verbatim, and then stated that "Dr. Elyea, IDOC Medical Director, was

consulted regarding inmate McCue's issue and advised that procedure must be followed." (Doc.

1-2 at 10). In Defendant Aldridge's deposition, he admits that he does not know if it was

Plaintiff's negligence that caused his dentures to break (Doc. 37-3 at 10). It is difficult to

understand then, how Defendant Elyea could rely on the above quoted administrative directive to

deny Plaintiff treatment unless and until he paid for such treatment.

Defendant Elyea cannot claim that he was unaware of Plaintiff's complaints and

grievances. Besides Defendant Caliper stating that she discussed Plaintiff's grievance with him,

Defendant Elyea admits in his summary judgment motion that he placed a call to Defendant

Aldridge on July 21, 2004, in which they discussed Plaintiff's complaints to the Comptroller

regarding his dental treatment and decided that Plaintiff would not receive a replacement denture

until he paid for it (Doc. 37 at 2).

Plaintiff has alleged a sufficient chronology of events from which a factfinder could

reasonably find that Defendant Elyea acted in a retaliatory manner when he denied Plaintiff

repaired or replaced dentures unless and until he provided payment to cover the procedure.

Accordingly, it is **RECOMMENDED** that Defendant Elyea be **DENIED** summary judgment on

Plaintiff's retaliation claim.

Defendant Caliper

In Defendant Caliper's Motion for Summary Judgment (Doc. 37), she states that

summary judgment should be entered in her favor because (1) as Health Care Unit

Administrator, she does not have the authority to make decisions regarding the provision of a

soft dental diet or a mouth guard, (2) although she is a registered nurse, her duties "by and large" do not include the actual treatment of inmates, and (3) she could not override Dr. Aldridge's determination that a rubber mouth guard was not feasible and would not be prescribed (Doc. 37 at 5, 8).

Even if all of these statements are true, Defendant Caliper is not entitled to judgment as a matter of law on Plaintiff's retaliation claim. Plaintiff engaged in constitutionally protected speech when he filed at least six grievances regarding his treatment during the approximately fourteen months he went without a denture. Each of these grievances were denied based on responses provided by Defendant Caliper, and Plaintiff claims that it was because he wrote these grievances, along with his many resident requests directed towards Defendant Caliper, that he was not allowed to be seen at sick call or scheduled in a timely manner to see a doctor. If there is sufficient evidence such that the factfinder could reasonably conclude that Plaintiff's complaints were a substantial or motivating factor behind this action, then summary judgment must be denied. Spiegla, 371 F.3d at 935. This Court finds that sufficient evidence does exist to support such a conclusion.

Two grievances are especially pertinent in this regard. On February 7, 2005, Plaintiff filed a grievance in which he state that he was told by one of the nurses that Defendant Caliper would not approve his requests to be seen at sick call (Doc. 1-2 at 14). Defendant Caliper provided a response, in which she did not deny giving such an order (Doc. 1-2 at 14). Just two days later, on February 9, 2005, Plaintiff filed another grievance in which he alleges that another nurse told him that Defendant Caliper stated that Plaintiff was not to be seen at sick call (Doc. 1-3 at 1). Plaintiff also alleges that other staff members have told him that the reason Defendant Caliper was denying him sick call was "so that it won't be documented for any future Civil

Action." (Doc. 1-3 at 1). This time Defendant Caliper provided a response stating that she denied Plaintiff's allegations (Doc. 1-3 at 1).

In addition, Plaintiff provided two sworn affidavits of two fellow inmates who state they overheard several nurses state that Defendant Caliper had ordered that Plaintiff was not to be seen at sick call (Doc. 1-4 at 6-8).

The two grievances and the two affidavits create a genuine issue of fact with regard whether Defendant Caliper gave an order to deny Plaintiff sick call in retaliation for filing grievances. Plaintiff's statements, if believed, would constitute direct evidence of retaliation by Defendant Caliper for Plaintiff's exercise of a constitutional right.

Here, for the Court to grant summary judgment to Defendant Caliper on Plaintiff's retaliation claim, it would have to make a determination not only that Plaintiff's testimony is not credible, but also find that his two fellow inmates are not credible. It is inappropriate for the Court to make such a determination, as credibility determinations are best left to the province of the trier of fact. Accordingly, it is **RECOMMENDED** that summary judgment be **DENIED** as to Defendant Caliper on Plaintiff's retaliation claim.

**Qualified Immunity**

Defendants Elyea and Caliper contend that they are entitled to qualified immunity because "the existing law with respect to the Plaintiff's claims states that a prison official is not deliberately indifferent to an inmate's serious medical needs if he or she provides a doctor and does not interfere with the doctor's care or fail to follow the doctor's orders." (Doc. 37 at 11). Defendants also argue that "[t]he law further states a prison official may rely on the diagnosis of a doctor in determining what action needs to be taken to treat the need." (Doc. 37 at 11). Neither of these assertions was supported by citation to authority.

Under Harlow v. Fitzgerald, 457 U.S. 800 (1982), governmental officials performing discretionary functions are entitled to qualified immunity from liability arising out of conduct that "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." See Babcock, 102 F.3d at 276 (quoting Harlow, 457 U.S. at 818).

When a defendant raises the defense of qualified immunity in a Section 1983 action, the court must engage in a two-part, objective inquiry to determine (1) whether the facts alleged, taken in light most favorable to the plaintiff, show that the official violated a constitutional right, and (2) if so, whether the right was clearly established at time of alleged injury. Payne v. Pauley, 337 F.3d 767, 775-76 (7th Cir. 2003) (citing Saucier v. Katz, 533 U.S. 194, 201-02 (2003).

Taking the facts alleged in the light most favorable to Plaintiff, a jury could reasonably conclude that Defendants Elyea and Caliper were deliberately indifferent to Plaintiff's serious medical and dental needs in that their actions delayed the time it took to get Plaintiff treatment for his swollen and bleeding gums caused by the absence of an repaired or replaced upper denture, or the absence of other means to mitigated the trauma. Further, it cannot be said that the right to adequate medical and dental care was not clearly established in the year 2004. In 2001 the Seventh Circuit recognized that dental care is "one of the most important medical needs of inmate," and that allegations that an inmate who is denied his dentures and cannot chew his food, and suffers bleeding, headaches, and disfigurement, states a serious medical need. See Wynn, 251 F.3d at 593. The law was, therefore, clearly established at the time Defendants Elyea and Caliper were alleged to have acted with deliberate indifference to Plaintiff's serious medical need.

A jury could also reasonably conclude that Defendants Elyea and Caliper retaliated against Plaintiff for exercising a constitutionally protected right. The evidence supports a finding

that Defendant Elyea and Caliper were aware of Plaintiff's grievances regarding his medical care at the time they allegedly acted in a retaliatory manner by delaying or denying him access to necessary medical care.  Further, the federal courts have long recognized a prisoner's right to seek an administrative or judicial remedy by filing grievances, as well as the right to be free from retaliation for exercising this right. Id.; Buise, 584 F.2d at 229; see also Penrod v. Zavaras, 94 F.3d 1399, 1404-05 (10th Cir.1996) ("[Q]ualified immunity ... does not apply in this case because the jurisprudence prohibiting retaliatory acts against prisoners for reporting grievances is well-established.").  The law was clearly established at the time of Defendant Elyea and Caliper's alleged retaliatory conduct, and summary judgment on qualified immunity grounds is, therefore, inappropriate.  Accordingly, this Court **RECOMMENDS** that Defendants Elyea and Caliper be **DENIED** summary judgment on the grounds of qualified immunity.

### CONCLUSION

Therefore, for the reasons set forth above, it is it is **RECOMMENDED** that the Motion for Summary Judgment (Doc. 32) be **DENIED**, that the Motion for Summary Judgment (Doc. 37) be **DENIED**, and that the Court adopt the foregoing findings of fact and conclusions of law.

Pursuant to 28 U.S.C. § 636(b)(1) and SDIL-LR 73.1(b), the parties shall have ten (10) days after service of this Recommendation to file written objections thereto.  The failure to file a timely objection may result in the waiver of the right to challenge this Recommendation before either the District Court or the Court of Appeals.  Snyder v. Nolen, 380 F.3d 279, 284 (7th Cir. 2004); United States v. Hernandez-Rivas, 348 F.3d 595, 598 (7th Cir. 2003).

**DATED: September 4, 2007**

s/ *Donald G. Wilkerson*
**DONALD G. WILKERSON**
**United States Magistrate Judge**